Brent O. Hatch (5715)
Hatch Law Group, PC
22 E. 100 S. Suite 400
Salt Lake City, Utah 84111
Telephone: (801) 869-1919
hatch@hatchpc.com

*Attorney for Defendant – Additional counsel listed in signature*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| EAGLE VIEW TECHNOLOGIES, INC. and PICTOMETRY INTERNATIONAL CORP., | **DEFENDANT'S MOTION FOR CLAIM CONSTRUCTION** |
| *Plaintiffs*, | Case No.: 2:21-cv-00283(TS)(DAO) |
| v. | Judge: Ted Stewart |
| NEARMAP US, INC., | Magistrate Judge: Daphne A. Oberg |
| *Defendant*. | |

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

    1.    The Asserted Patents and Level of Ordinary Skill in the Art ............................... 2

    2.    Legal Standard for Claim Construction .................................................................. 2

II.    DISCUSSION .......................................................................................................4

    1.    "roof report" / "roof estimate report" in all asserted claims of the '960, '568, '961, '737, '152, and '149 Patents........................................................... 4

    2.    "aerial image(s)" / "aerial image file(s)" in all asserted claims of the '960, '568, '961, '737, '152, and '149 Patents........................................................... 7

    3.    "oblique image(s)" in all asserted claims of the '518 Patent and "wherein the primary and secondary oblique images match the perspectives from which the primary and secondary oblique images were captured" in all asserted claims of the '518 Patent.......................................................... 10

    4.    "calibrating / calibrate / calibrated . . . using calibration information" in all asserted claims of the '960, '568, and '961 Patents............................................. 12

    5.    "providing a visual marker that is moveable on a computer monitor around said region, said visual marker initially corresponding to said first location data, wherein said visual marker may be moved to a final location on top of the building to more precisely identify the location of the building roof structure, the final location having location coordinates" in all asserted claims of the '880 Patent............................................................................ 14

    6.    "three-dimensional model" / "3D model" in all asserted claims of the '960, '568, '152, and '149 Patents; claims 21, 24, and 25 of the '961 Patent; and claims 10, 17, and 25 of the '737 Patent............................................................. 15

    7.    "primary oblique image including overlapping data" in all asserted claims of the '518 Patent ....................................................................................... 20

    8.    "the [first and second / plurality of] aerial images . . . taken independent[ly] of each other" in all asserted claims of the '568 Patent; and claims 1, 2, 7, 21, 22, 24, 25 of the '961 Patent............................................. 23

III.    CONCLUSION....................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

**Cases**

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
   239 F.3d 1343 (Fed. Cir. 2001) ................................................................................. 16

*Aylus Networks, Inc. v. Apple Inc.*,
   856 F.3d 1353 (Fed. Cir. 2017) ................................................................................... 3

*Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*,
   533 F.3d 1362 (Fed. Cir. 2008) ................................................................................... 5

*Eagle View Techs., Inc. and Pictometry Int'l Corp. v. Xactware Sols., Inc. and Verisk Analytics,*
   *Inc.*, Case No. 1:15-cv-7025-RBK-JS (D.N.J.) ........................................................... 7

*Function Media, LLC v. Google, Inc.*,
   708 F.3d 1310 (Fed. Cir. 2013) ................................................................................. 13

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   481 F.3d 1371 (Fed. Cir. 2007) ............................................................................. 2, 16

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
   357 F.3d 1340 (Fed. Cir. 2004) ................................................................................... 3

*Nystrom v. TREX Co., Inc.*,
   424 F.3d 1136 (Fed. Cir. 2005) ................................................................................. 14

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
   521 F.3d 1351 (Fed. Cir. 2008) ................................................................................... 1

*Omega Eng'g, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003) ................................................................................... 7

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ..................................................................... 1, 2, 3, 20

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
   400 F.3d 901 (Fed. Cir. 2005) ................................................................................... 21

*Realtime Data, LLC v. Stanley*,
   554 F. App'x 923 (Fed. Cir. 2014) ........................................................................ 4, 24

## TABLE OF AUTHORITIES (CONT.)

**Page(s)**

*Renishaw PLC v. Marposs Societa' per Azioni,*
    158 F.3d 1243 (Fed. Cir. 1998) ................................................................................. 1

*TALtech Ltd. v. Esquel Apparel, Inc.,*
    279 F. App'x 974 (Fed. Cir. 2008) ......................................................................... 13

*Teva Pharms. USA, Inc. v. Sandoz, Inc.,*
    574 U.S. 318 (2015) ................................................................................................... 4

## I.      INTRODUCTION

Defendant Nearmap US, Inc. ("Nearmap") respectfully requests that the Court adopt Nearmap's proposed construction for nine claim terms that are material to the parties' patent non-infringement and invalidity disputes.  Nearmap's proposed constructions are consistent with what the patents actually teach and the inv`entors allegedly invented:

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.  The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).  In contrast, Plaintiffs Eagle View Technologies, Inc. ("EVT") and Pictometry International Inc. ("Pictometry") (collectively, "EagleView") assert that all nine terms should be accorded their "plain and ordinary meaning" without proposing any constructions of their own.  Despite that approach, EagleView's contentions appear to construe these terms presenting a dispute with Nearmap's proposed constructions.  Where, as here, the "parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

EagleView's positions are contrary to what it told the Patent Office during prosecution of the patents and what it told this Court in opposing Nearmap's Motion to Dismiss Under 35 U.S.C. § 101 (Dkt. No. 41).  EagleView cannot have it both ways.  If EagleView is to be held to the narrow reading of the patents that it argued to this Court and the Patent Office, then Nearmap does not infringe because its technology does not fit within those narrow claims.  *See Phillips*,

415 F.3d at 1303.  But if EagleView's current claim construction positions, which propose a much broader reading, are to be believed, then the patents are invalid because they would encompass any display of roof measurements and thereby ensnare the prior art.  Under EagleView's proposed claim construction, Nearmap will file a new Motion to Dismiss.  *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1374–75, 1380 (Fed. Cir. 2007) (invalidating patent claims on the basis of claim construction that patentee had successfully pressed in order to assert infringement, noting "[t]he motto, 'beware of what one asks for,' might be applicable here").

1.      **The Asserted Patents and Level of Ordinary Skill in the Art**

There are eight asserted patents.  U.S. Patent Nos. 8,209,152 ("the '152 Patent"), 9,135,737 ("the '737 Patent"), 10,685,149 ("the '149 Patent"), 8,670,961 ("the '961 Patent"), 9,514,568 ("the '568 Patent"), and 10,528,960 ("the '960 Patent") (collectively, "the EVT Asserted Patents") are members of two different families, with overlapping or substantially identical specifications.  The two remaining asserted patents are owned by Pictometry: U.S. Patent Nos. 8,593,518 ("the '518 Patent") and 8,542,880 ("the '880 Patent").

Nearmap submits that a person of ordinary skill in the art at the time of the alleged inventions would have had at least a Bachelor's Degree in an academic area emphasizing the design of electrical, computer, or software technologies, or a similar discipline, and at least two years of experience related to computerized image analysis and three-dimensional modeling.  Superior education could compensate for a deficiency in work experience, and vice versa.

2.      **Legal Standard for Claim Construction**

The claim language and specification, along with the prosecution history of the patent, are

2

collectively referred to as intrinsic evidence, and constitute the primary sources for interpreting

claim terms. *Phillips*, 415 F.3d at 1317. Claim construction begins with the language of the

patent claims because they provide "substantial guidance as to the meaning of particular claim

terms." *Id.* at 1314–15 (citations omitted). The context in which a term is used in an asserted

claim can be highly instructive. *See id.* at 1314. The patent specification is also important.

Being part of a "fully integrated written instrument" that consists principally of a specification

that concludes with claims, the claims "must be read in view of the specification, of which they

are a part." *Id.* at 1315. Indeed, the specification is "the single best guide to the meaning of a

disputed term" and is usually considered "dispositive." *Id.*

In addition, the prosecution history informs "the meaning of the claim language by

demonstrating how the inventor understood the invention and whether the inventor limited the

invention in the course of prosecution, making the claim scope narrower than it would otherwise

be." *Id.* at 1317. The same is true for the prosecution histories of related applications: "[a]ny

statement of the patentee in the prosecution of a related application as to the scope of the

invention would be relevant to claim construction," *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357

F.3d 1340, 1350 (Fed. Cir. 2004). The record from *inter partes* review of a patent is considered

part of the prosecution history of that patent and related patents. *See Aylus Networks, Inc. v.

Apple Inc.*, 856 F.3d 1353, 1361 (Fed. Cir. 2017) ("Because an IPR [*inter partes* review]

proceeding involves reexamination of an earlier administrative grant of a patent, it follows that

statements made by a patent owner during an IPR proceeding can be considered during claim

construction and relied upon to support a finding of prosecution disclaimer."); *Realtime Data,*

*LLC v. Stanley*, 554 F. App'x 923, 933–34 (Fed. Cir. 2014) (affirming construction that relied on sworn statements of patentee in related patent reexaminations).

Extrinsic evidence such as expert testimony may also be considered during claim construction to determine whether "a certain term of art had a particular meaning to a person of ordinary skill in the art at the time of the invention." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 332 (2015). The court must "conduct a legal analysis: whether a skilled artisan would ascribe that same meaning to that term in the context of the specific patent claim under review." *Id.* That is because "experts may be examined to explain terms of art, and the state of the art, at any given time, but they cannot be used to prove the proper or legal construction of any instrument of writing." *Id*. (internal quotation marks omitted). Here, Nearmap submits that expert testimony is not needed to resolve the parties' present claim construction disputes, but Nearmap reserves the right to submit an expert declaration with its responsive brief to rebut any arguments EagleView makes in its opening brief.

## II.   DISCUSSION

Nearmap respectfully requests that the Court adopt Nearmap's proposed construction for the nine following claim terms that are material to the parties' patent non-infringement and invalidity disputes, at least for the reasons discussed in Nearmap's summary judgment motion.

1.   **"roof report" / "roof estimate report"** in all asserted claims of the '960, '568, '961, '737, '152, and '149 Patents

| EagleView's Proposed Construction | Nearmap's Proposed Construction |
|---|---|
| no construction necessary | an electronic file or paper document transformed from a roof model and/or determined roof measurements that graphically shows a representation of the roof model and/or determined roof measurements |

EagleView argued at the start of this case that claim construction was needed to resolve the "requirements associated with the presence of a roof report."  Aug. 5, 2021 Opp'n to Mot. to Dismiss at 25 (A547).  Now, EagleView contends that no construction is needed because its infringement contentions read the terms so broadly as to encompass any display of roof measurements.  Nearmap, on the other hand, seeks a narrower claim construction, which is aligned with the intrinsic evidence.

The language of the claims at issue supports Nearmap's construction because each of these claims recite a roof report that includes a roof model or roof measurement information such as pitch, slope, area, and lengths of edges, but do not recite that the model and measurement information each independently is a roof report.  *See* '960 Patent, Claim 1 (JA0088); '568 Patent, Claim 1 (JA0062); '961 Patent, Claim 1 (JA0030); '737 Patent, Claim 1 (JA0186); '152 Patent, Claim 1 (JA0134); '149 Patent, Claim 1 (JA0240–41).  "The fact that the claim distinguishes between [one term] and [another term in the same claim] is significant" because "[d]ifferent claim terms are presumed to have different meanings."  *Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008).

Likewise, the specifications of the EVT Asserted Patents describe the "roof estimate report [as] ***based on*** the generated model and/or the determined roof measurement information." '152 Patent, Col.2:8–10 (JA0123) (emphasis added); '737 Patent, Col.2:1–2 (JA0175); '568 Patent, Col.11:61–67 (JA0060); '961 Patent, Col.11:54–59 (JA0028); '152 Patent, Col.17:19–24 (JA0131); '149 Patent, Col.17:57–63 (JA0237); *see* '737 Patent, Col.2:58–64 (JA0175); '152 Patent, Col.2:66–3:5 (JA0123).  And the specifications repeatedly make clear that data files about a roof model are not themselves roof reports.  For example, the specification describes

5

certain embodiments in which the three-dimensional model is stored as model data and sent

directly to a customer, for example, as a "data file, in any acceptable format" that may then be

used by some other computing system, such as a drawing program, for further processing, and is

not sent as a roof report.  These data files are provided to customers "without first being

transformed into a report":

> In some embodiments, one or more of the 3D models stored as *model data* 606 are
> provided directly to the customer, *without first being transformed into a report*.
> For example, a 3D model may be exported as a data file, in any acceptable format,
> that may be consumed or otherwise utilized by some other computing system, such
> as computer-aided design ("CAD") tool, drawing program, etc.

'961 Patent, Col.10:38–44 (JA0027) (emphases added).[1]  Nowhere in the specifications is the

claimed roof report described as the mere display of separate roof measurement information on a

website.  On the contrary, the patents take pains to show that a roof report is—as the term

suggests—a discrete document, including as an example a six-page report that is Figure 3 of the

'152 Patent (JA0096–101).  The specifications also make clear that roof measurement

information is not a report but is used to generate a roof report: "[r]oof measurement information

*may be used to generate a roof estimate report* that provides and graphically shows this

information."  '152 Patent, Col.1:66–2:2 (JA0123) (emphasis added); '149 Patent, Col.2:18–20

(JA0229).[2]

---

[1] '568 Patent, Col.10:44–50 (JA0059); *see* '737 Patent, Col.7:9–18 (JA0178) ("one or more of
the models stored as model data 106 are provided directly to the customer or other computing
system, without first being transformed into a report" and providing that "a model and/or roof
measurement information based thereon may be exported"); '152 Patent, Col.7:17–26 (JA0126)
(same); '149 Patent, Col.7:44–53 (JA0232) (same); '737 Patent, Col.6:28–30 (JA0177); '152
Patent, Col.17:24–32 (JA0131).

[2] *See* '568 Patent, Col.14:39–42 (JA0061); '737 Patent, Col.8:14–20 (JA0178).

EVT's statements during prosecution of the '961 Patent confirm that Nearmap's proposed construction is correct.  There, EVT argued that the prior art reference Nishitani did not render the pending independent claims obvious because Nishitani disclosed "transmitting the ***three-dimensional roof shape data having roof measurements*** as input to (***which is not a report***) the module determination component to facilitate estimation of installation cost of the photovoltaic power generator."  '961 File History, Feb. 28, 2013 Remarks at 12 (JA0518) (emphases added).  This is a clear and unmistakable disclaimer that excludes 3D model data with roof measurements from the construction of "roof report."  *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325–26 (Fed. Cir. 2003).[3]

2.      **"aerial image(s)" / "aerial image file(s)"** in all asserted claims of the '960, '568, '961, '737, '152, and '149 Patents

| EagleView's Proposed Construction | Nearmap's Proposed Construction |
|---|---|
| no construction necessary | photograph taken from the air by a camera |

Nearmap's construction is consistent with the construction that the District of New Jersey adopted at EagleView's request: "an image taken from the air."  *Eagle View Techs., Inc. and Pictometry Int'l Corp. v. Xactware Sols., Inc. and Verisk Analytics, Inc.*, Case No. 1:15-cv-7025-RBK-JS (D.N.J.), 2d Am. Joint Claim Construction & Prehearing Statement at 4–5 (A425–26); *id.*, Jury Instructions at 24 (A467).

_____

[3] Further, in response to an *inter partes* review petition of the '152 Patent, EVT argued that the proposed "roof estimate report" construction was too broad because "'representations'—such as the claimed roof model or aerial images—are explicitly contrasted in the claim language with the separately claimed 'report' that is generated ***based on those items***, and is accordingly improper." IPR2016-00591, Patent Owner Prelim. Resp. at 7 (A305) (emphasis in original).  The Patent Office ultimately determined, without addressing the parties' arguments, that it did not need to construe any claim terms.

As an initial matter, this construction is not the same as the parties' agreed-upon construction for the term "aerial image" / "aerial imagery" in the '880 Patent which has an express definition of the term.  Nearmap's construction is supported by the claims, which refer to "aerial image(s)" / "aerial image file(s)" as having been "taken," just as a photograph taken by a camera.  '737 Patent, Claim 1 (JA0186); '960 Patent, Claim 1 (JA0088); '961 Patent, Claims 1, 21–22, 24 (JA0030–32); '568 Patent, Claims 6, 11 (JA0063–64).

Likewise, the specifications of the EVT Asserted Patents describe aerial images created by taking a photograph: "aerial images may be originally created by cameras mounted on airplanes, balloons, satellites, etc."  '152 Patent, Col.21:38–40 (JA0133); '737 Patent, Col.21:28–30 (JA0185); '149 Patent, Col.22:16–18 (JA0239); '961 Patent, Col.14:2–4 (JA0029); '568 Patent, Col.14:13–15 (JA0061).  "In one embodiment, an aircraft, such as an airplane or helicopter is utilized to take photographs while flying over one or more properties.  Such aircraft may be manned or unmanned."  '152 Patent, Col.7:47–58 (JA0126); '737 Patent, Col.7:40–51 (JA0178); '149 Patent, Col.8:7–19 (JA0232).  Further, the specifications describe that "an aerial and/or satellite imagery database" contains "photographs."  '961 Patent, Col.6:34–43 (JA0025); '568 Patent, Col.6:32–42 (JA0057); '960 Patent, Col.5:52–6:2 (JA0087).  The specifications also describe aerial images as containing information that is contained in a photograph taken by a camera.  For example, the aerial images have "corresponding meta-information.  Such meta-information may include details about the type of camera used (e.g., focal length, exposure, etc.), the position of the camera (e.g., GPS coordinates of the aircraft at the time the image was captured), the orientation of the camera (e.g., the angle of the camera), the time and/or date the image was captured, etc."  '152 Patent, Col.8:10–17 (JA0126); '737 Patent, Col.8:3–9 (JA0178);

8

'149 Patent, Col.8:38–44 (JA0232).[4]  The specifications do not describe examples of an aerial image other than that of a photograph.

The '960 Patent prosecution makes clear the Patent Office's view that the invention requires aerial images taken from the air: "[t]he claimed invention requires a combination of complicated aerial image acquisition systems ('overhead aircraft, a balloon, or satellite')."  '960 File History, Jan. 2, 2015 Office Action at 5 (JA1624).  EVT's response confirmed: "The present invention deals with receiving data from an outside source, in this case photographic images, processing those photographic images through a computer software program. . . ."  '960 File History, July 2, 2015 Remarks at 24 (JA1677).  Further, in an inventor presentation to the Patent Office, EVT described aerial images as an "acquisition" by or "taken from" a camera.  '960 File History, Oct. 17, 2013 Inventor Presentation at 4, 6–7, 24 (JA2891, JA2893–94, JA2911).  And the Patent Office examiner characterized the images as "having been photographed."  '960 File History, Dec. 20, 2017 Applicant-Initiated Interview Summary at 1 (JA2448).  So too, during '961 Patent prosecution, the Patent Office understood that aerial images have associated "camera models."  '961 File History, Aug. 28, 2012 Office Action at 6 (JA0398).

---

[4] *See* '152 Patent, Col.20:54–58 (JA0132) ("In some embodiments, the aerial image has corresponding meta-information that includes image capture conditions, such as camera type, focal length, time of day, camera position (e.g., latitude, longitude, and/or elevation), etc."); '737 Patent, Col.20:42–46 (JA0184) (same); '149 Patent, Col.21:28–32 (JA0239) (same).

**3.** "oblique image(s)" in all asserted claims of the '518 Patent and **"wherein the primary and secondary oblique images match the perspectives from which the primary and secondary oblique images were captured"** in all asserted claims of the '518 Patent

| Claim Term(s) | EagleView's Proposed Construction | Nearmap's Proposed Construction |
|---|---|---|
| **"oblique image(s)"** | no construction necessary | an image captured at an angle that is still in the original form the camera captured and has not been re-projected into a mathematical model |
| **"wherein the primary and secondary oblique images match the perspectives from which the primary and secondary oblique images were captured"** | no construction necessary | wherein the primary and secondary oblique images are displayed as captured and not re-projected, warped or distorted |

Nearmap's proposed constructions align with the intrinsic evidence that an oblique image is an image in its original form as captured by a camera. EagleView apparently disagrees because it alleges infringement based on a construction that an oblique image can encompass content types that are derived from processed images. This is contrary to the intrinsic evidence.

The claim language supports Nearmap's proposed construction because each of the independent claims requires that "the primary and secondary oblique images match the perspectives from which the primary and secondary oblique images were *captured*." '518 Patent, Claims 1, 13–16 (JA0257, JA0258–59) (emphasis added). That the claimed oblique images are required to be "captured" makes clear that the images are captured by a camera and not processed further such as in a re-projection into a mathematical model.

10

Likewise, the specification describes oblique images as captured by a camera (as opposed to further processed to be re-projected into a mathematical model), and that the oblique images are taken at an angle. The specification distinguishes between:

>   1. Captured Imagery—these images have the appearance they were captured by the camera or sensor employed.

>   2. Projected Imagery—these images have been processed and converted such that they confirm to a mathematical projection.

'518 Patent, Col.1:26–32 (JA0252). The specification then makes clear that captured oblique images fall into the first category. The specification describes that, "with an oblique image, **because it is still in the original form the camera captured and has not been re-projected into a mathematical model**, it is not necessarily true that the compass directions meet at right angles within the image." '518 Patent, Col.2:61–65 (JA0252) (emphasis added).[5] In addition, the specification confirms that "an oblique image, by definition, is **captured at an angle**." '518 Patent, Col.2:26–27 (JA0252) (emphases added). "The oblique perspective means that image pixels are not aligned on a rectangular grid but are aligned to the perspective that matches the perspective **the camera has captured**." '518 Patent, Col.3:29–32 (JA0253) (emphasis added).

The prosecution history also supports Nearmap's construction. Pictometry added the claim term "wherein the primary and secondary oblique images match the perspectives from which the primary and secondary oblique images were captured" to overcome a prior art rejection based on the prior art reference Steedly. '518 File History, May 10, 2012 Claims 2–8

---

[5] *See* '518 Patent, Col.1:16–18 (JA0252) ("More particularly, the presently claimed and disclosed invention(s) use a methodology whereby separate obliquely captured images are panned in a continuous fashion."); '518 Patent, Col.2:26–29 (JA0252) ("Since an oblique image, by definition, is captured at an angle, it presents a more natural appearance because it shows the sides of objects and structures—what we are most accustomed to seeing.").

(JA5289–95).  According to Pictometry, the specification supported the claim amendment because it disclosed "[t]he oblique perspective means that image pixels are not aligned on a rectangular grid but are aligned to the perspective that matches the perspective *the camera has captured*."  '518 File History, May 10, 2012 Remarks at 10 (JA5297) (emphasis added).  The Patent Office later allowed the claims after several additional amendments.  '518 File History, Sept. 10, 2013 Notice of Allowance at 1 (JA5423).

    **4.**    **"calibrating / calibrate / calibrated . . . using calibration information"** in all asserted claims of the '960, '568, and '961 Patents

| EagleView's Proposed Construction | Nearmap's Proposed Construction |
|---|---|
| no construction necessary | converting the distance in pixels between two points on an aerial image into a physical length using image scale information after the aerial image and image scale information is received by roof measurement software |

Nearmap's construction addresses: (1) what the claimed step of "calibrating" encompasses and (2) when that step takes place in the order of claimed steps.  ***First,*** claim 1 of the '960 Patent specifies that the claimed process for generating a roof report involves "calibrating at least one of the first and second aerial image files . . . to convert a distance in pixels between two points on the [] aerial image file into a physical length."  '960 Patent, Claim 1 (JA0088).  The claim also specifies that the conversion of lengths is performed "using [] calibration information" that is "associated with" the image file, or image scale information, much like the scale on a map.  '960 Patent, Claim 1 (JA0088).  And all three patent specifications expressly confirm that "[d]uring calibration, the distance in pixels between two points on the image is converted into a physical length."  '960 Patent, Col.6:5–6 (JA0087); '568 Patent, Col.6:45–46 (JA0057); '961 Patent, Col.6:45–47 (JA0025).  The three patent

specifications further explain that "calibration information" is "typically presented as a scale marker on the image itself, or as additional information supplied by the image database provider along with the requested image," *id*., consistent with a construction of "calibration information" as "image scale information." The prosecution histories of the patents reveal that the Patent Office deemed the calibrating step as "essential to implementing the invention." '960 File History, Jan. 2, 2015 Office Action at 9 (JA1628). In amending its claims to overcome a rejection, EVT added a calibrating step that "refers to converting the distance in pixels between two points on the image into a physical length." '960 File History, July 2, 2015 Remarks at 60– 61 (JA1713–14). EVT also explained that "[t]he term 'calibration information' refers to image scale information on the image." '960 File History, July 2, 2015 Remarks at 61 (JA1714).

   ***Second,*** the "calibrating" step is performed by roof measurement software after receiving the aerial image file. The plain language of the claims specify that the calibration is performed on "the" aerial image file after the aerial image file is received by the processor. '960 Patent, Claim 1 (JA0088). Construing the "calibrating" term based on this order of steps not only makes grammatical sense, but also logical sense—for the processor to calibrate the aerial image files, it must first receive those files. *See Function Media, LLC v. Google, Inc*., 708 F.3d 1310, 1320 (Fed. Cir. 2013); *TALtech Ltd. v. Esquel Apparel, Inc*., 279 F. App'x 974, 978 (Fed. Cir. 2008). The specifications state that the "image[s] and calibration information" is "entered or imported" into "measurement software," '960 Patent, Col.6:11–13 (JA0087); '568 Patent, Col.6:51–53 (JA0057); '961 Patent, Col.6:51–53 (JA0025). What that means is that the measurement software receives the images and calibration information, then calibrates those images using the calibration information. *See* '960 Patent, Col.2:9–12 (JA0085). Although the "calibrating" term

13

is phrased slightly differently in the claims of the '568 and '961 Patents compared to the '960 Patent discussed above, the same construction applies to each of the variations of this term across the three patents which belong to the same patent family and share identical written descriptions of the calibrating step. *See* '960 Patent, Col.6:3–11 (JA0087); '568 Patent, Col.6:43–50 (JA0057); '961 Patent, Col.6:44–50 (JA0025); *see also Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005)

    **5.** **"providing a visual marker that is moveable on a computer monitor around said region, said visual marker initially corresponding to said first location data, wherein said visual marker may be moved to a final location on top of the building to more precisely identify the location of the building roof structure, the final location having location coordinates"** in all asserted claims of the '880 Patent

| EagleView's Proposed Construction | Nearmap's Proposed Construction |
|---|---|
| no construction necessary | providing a shape, pointer, label, icon, avatar or other indicator that initially corresponds to the first location data input by the user, and that is draggable on a computer monitor from its initial location to a final location on top of a building to more precisely identify the location of the building structure corresponding to the first location data |

    The language of the claims requires that the visual marker be "moveable," and further recites "providing a computer input capable of signaling user-acceptance of the final location of said marker." '880 Patent, Claims 1, 14 (JA0289–90). The dependent claims also distinguish between a marker and "outline drawings around outlines corresponding to roof planes based on tracing from said imagery," such as a polygon or line measurement tool. '880 Patent, Claims 4, 7, 17, 19 (JA0289–90). The specification describes the visual marker as moveable "by click[ing] and dragging via computer mouse, arrows, or otherwise." '880 Patent, Col.10:6–12 (JA0287); *see* '880 Patent, Col.1:47–54 (JA0261) (describing marker as "moved to"); '880 Patent,

Col.10:12–15 (JA0287) ("Optionally, in FIG. 4C when said marker has been moved to final location 106b, the user may activate a selection confirmation, such as confirm selection button 104, enter, checkbox or otherwise.").  For example, in Figures 4B and 4C, a single marker is moved from an initial position (Fig. 4B, ref. 106a) to a final position (Fig. 4C, ref. 106b):



'880 Patent, Figs. 4B, 4C (JA0266–67) (excerpts; highlighting added for emphasis).

EagleView's apparent attempt to equate a displayable marker with a moveable marker fails because the definition of a "visual marker" distinguishes between them, as does the definition EVT agreed to in the '880 Patent *inter partes* review proceeding.  '880 Patent, Col.2:47–48, 5:9–12 (JA0283, JA0285); IPR2016-00594, Feb. 8, 2016 Petition at 6 (A168); IPR2016-00594, June 2, 2016 Patent Owner Prelim. Resp. at 5 (A379).

6.    **"three-dimensional model" / "3D model" in all asserted claims of the '960, '568, '152, and '149 Patents; claims 21, 24, and 25 of the '961 Patent; and claims 10, 17, and 25 of the '737 Patent**

| EagleView's Proposed Construction | Nearmap's Proposed Construction |
|---|---|
| no construction necessary | a three-dimensional representation of a building roof that is generated based on aerial images with different views of the roof, which provides roof measurement information such as length, pitch, and area of sections of the roof |

As with the "roof report" term, EagleView argued to the Court at the outset of this case that the patents did not just claim a generic three-dimensional model, but a very specific type of

model, in order to avoid a ruling of invalidity under Section 101.  Aug. 5, 2021 Opp'n to Mot. to Dismiss at 11 (A533).  According to EagleView, the claims "absolutely show how" and "walk[] through a very specific set of steps in order to create a three-dimensional model of the roof."  Nov. 8, 2021 Mot. to Dismiss Hr'g Tr. at 35:9–14 (A584).  Of particular note, EagleView represented to the Court that Nearmap's motion should be denied because claim construction was needed relating to "the claimed requirements for creating and projecting a 3D model."  Aug. 5, 2021 Opp'n to Mot. to Dismiss at 25 (A547).

EagleView now reverses course, asserting that the claimed 3D model is nothing special and that the plain and ordinary meaning applies.  But the meaning of a patent claim is not a nose of wax, to be twisted one way to avoid § 101 invalidity and another to attempt to find infringement.  *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001).  If the claimed three-dimensional model is nothing more than a visual rendering of a three-dimensional object, as EagleView appears to assert in its infringement contentions, the patent claims are invalid.  *See Liebel-Flarsheim*, 481 F.3d at 1374–75, 1380.

EagleView's about-face notwithstanding, construction of the term "three-dimensional model" is needed to resolve the parties' disputes regarding claim scope.  According to EagleView's infringement contentions, any visual rendering of a three-dimensional object can satisfy this limitation including two-dimensional outline drawings and three-dimensional meshes from which roof measurements are not made.  This reading is contrary to the intrinsic evidence, whereas Nearmap's construction is supported by the intrinsic evidence.

The majority of EagleView's patent claims say little about the three-dimensional model.  And the few claims that do recite any specifics about the three-dimensional model draw a

16

distinction with a "line drawing" or "wire frame model."  For example, Claims 1, 4, 6, 9, 12, 16, 26, 27, 29, 30, 31, 34 and 35 of the '737 Patent all recite line drawings overlaid on an aerial image, whereas claims 2, 11, 13, 15, 17, 18 and 25 separately recite a "three dimensional model."  (JA0186–88).  Further, dependent claims 2 and 25 of the '737 Patent recite modifying a three-dimensional model "before displaying," or "based on the modification of," a line drawing, establishing that the three-dimensional model is not the same as a line drawing.  (JA0186–88).  Similarly, claim 37 of the '737 Patent recites that "corresponding changes in a 3D model of the roof [are] based on the changes made by [a] user to [a] wire frame model," establishing that a "three-dimensional model" is not the same as a "wire frame model."  (JA0188).  This is the same for the claims of the related '152 and '149 Patents.  *See* '152 Patent, Claims 1, 12, 16 (JA0134–35) (distinguishing "three-dimensional model" from a "projection of [a] feature" of the model as a "line drawing" on an aerial image); '149 Patent, Claims 11, 12 (JA0241) (distinguishing between three-dimensional model and "wireframe rendering" of the model).  And nothing about the claims of the '960, '568, and '961 Patents suggest otherwise.  All the patent claims that include "roof measurement information" further show that such information is based on a three-dimensional model, or at the very least do not say otherwise.  *See*, *e.g.*, '960 Patent, Claim 1 (JA0088) (determining pitch and area based on image analysis that involves constructing three-dimensional model); '152 Patent, Claims 9, 12 (JA0134–35) ("transmitting roof measurement information based at least in part on the modified three-dimensional model"); '149 Patent, Claims 9, 13 (JA0241) ("transmitting roof measurement information based on the modified model of the roof," which "includes" modified "three-dimensional model of the roof").

17

Further, EagleView knew how to recite a "three dimensional wire frame model" and certainly could have done so if that is what it intended to claim. But EagleView chose not to do so, and it cannot rewrite its claims now to assert infringement. The '568 and '961 Patent specifications describe the three-dimensional model as something separate from a rendered view of the model.[6] Contrary to EagleView's seeming infringement argument that a wire frame model itself can be the claimed "three-dimensional model," the specifications of the '737, '152, and '149 Patents describe "the construction of a three dimensional wire frame model of a building roof, based on the specification of roof features by an operator" separately from a "3D model." '737 Patent, Col.13:38–14:12 (JA0181); '152 Patent, Col.13:52–14:23 (JA0129); '149 Patent, Col.14:20–14:53 (JA0235). That generation of the "three dimensional wire frame model" is described as being constructed by using a "drawing tool" to "specify roof features, such as edges, ridges, valleys, corners, etc." *Id*. By contrast, the generation of the "three

---

[6] *See, e.g.*, '568 Patent, Col.14:46–49 (JA0061) ("The roof estimate report may be an electronic file that includes images of the building and/or its roof, as well as line drawings of one or more views of the three-dimensional model of the building roof."); '961 Patent, Col.14:35–38 (JA0029) (same); '737 Patent, Col.8:14–20 (JA0178) ("The roof estimate report may be based on a computer model (e.g., a 3D model) of the roof, and includes one or more views of the model" and "the various views of the model are presented as annotated line drawings, which provide information about the roof, such as the roof section areas, roof section edge lengths, roof section pitches, etc."); '737 Patent, Col.14:2–12 (JA0181) (distinguishing between "outline," "wire frame," "series of connected line segments that result in a closed polygon representing a planar roof section" and a "3D model that corresponds to roof"); '737 Patent, Col.14:62–15:6 (JA0178–79) (distinguishing between "shaded wire frame [] representation of the 3D model" and describing changes made to "the underlying 3D model" when "wire frame" is "manipulat[ed]"); '737 Patent, Col.15:32–37 (JA0179) (distinguishing between "3D model" of roof and view of "wire frame [] representation of the 3D model of the roof"); '737 Patent, Col.22:42–59 (JA0185) (distinguishing between "three-dimensional model" and "closed polygon that represents the outline or perimeter of the planar roof section"); '152 Patent, Col.22:50–67 (JA0133) (same); '149 Patent, Col.22:37–51 (JA0239) (same).

dimensional model" is described, if at all, as being constructed by image analysis, such as with a reference grid. *See, e.g*., '737 Patent, Col.4:66–5:27 (JA0181–82).  Likewise, the '568 and '961 Patent specifications describe the three-dimensional model as that from which roof measurements are made. *See, e.g*., '568 Patent, Col.6:54–7:23 (JA0057–58) (describing area, pitch, and length measurements as "information from the reconstructed [3D] model"); '961 Patent, Col.6:54–7:22 (JA0025–26) (same).  The '737, '152, and '149 Patent specifications also state, consistent with Nearmap's proposed construction, that the Roof Estimation System "generates a model of the roof of the building, which is *then utilized to determine roof measurement information*.  The roof measurement information may include measurements *such as lengths of the edges of sections of the roof, pitches of sections of the roof, areas of sections of the roof, etc*.  '737 Patent, Col.2:52–58 (JA0175) (emphasis added); '152 Patent, Col.2:60–66 (JA0123) (same); '149 Patent, Col.3:13–18 (JA0230) (same).  The '149 Patent specification similarly states in the Summary section: "[T]he roof estimation system is configured to determine roof measurement information and generate a roof estimate report *based on* the generated model and/or the determined roof measurement information."  '149 Patent, Col.2:26–29 (JA0229) (emphasis added).  And, again, nothing in the '960 Patent specification is to the contrary.

The prosecution histories, too, are replete with statements that repeatedly and consistently describe the three-dimensional model as used to determine roof measurement information.  During the prosecution of the '578 Patent—the parent patent to all three of the '960, '568, and '961 Patents—EVT argued that the prior art did not teach or suggest "determining measurements by constructing a three dimensional geometry of the roof based on the received aerial images,"

'578 File History, Jan. 18, 2011 Remarks at 31 (A033).  Additionally, in opposition to

Nearmap's petition for *inter partes* review of the '961 Patent, EVT asserted that a three-

dimensional model requires "calculat[ing] or determin[ing] the actual pitch of the roof sections

depicted in the model based on performing aerial image analysis."  IPR2022-01009, Sept. 16,

2022 Patent Owner's Prelim. Resp. at 9–10 (A655–56).  EVT further argued that "generally

depicting an angled roof *visually* in a 3D rendering is not the same as calculating or determining

a numerical pitch value of a roof."  IPR2022-01009, Sept. 16, 2022 Patent Owner's Prelim.

Resp. at 10 (A656) (emphasis in original).  EVT also argued that the prior art did not disclose the

required "three-dimensional model" because "the [prior art] model is *not* calculating or

determining the pitch of the roof sections."  IPR2022-01009, Sept. 16, 2022 Patent Owner's

Prelim. Resp. at 11 (A657) (emphasis added).

7. **"primary oblique image including overlapping data"** in all asserted claims of
the '518 Patent

| EagleView's Proposed Construction | Nearmap's Proposed Construction |
|---|---|
| no construction necessary | primary oblique image including common features with an adjacent oblique image |

EagleView asks that this term not be construed.  But EagleView's infringement

contentions interpret this term to mean content that is not an oblique image or a single oblique

image where there is no overlapping data.

Nearmap's construction is consistent with "what the inventors actually invented and

intended to envelop with the claim," *Phillips*, 415 F.3d at 1316, which is to allow "panning

oblique images in a continuous manner . . . to provide a useable means of navigation."  '518

Patent, Col.9:31–33 (JA0256); '518 Patent, Col.3:55–62 (JA0253); *see* '518 Patent, Title

(JA0243) ("Computer System for Continuous Oblique Panning").  The '518 Patent describes

only two ways in the art to "create the appearance of a continuous, seamless image[:] by simply displaying such images adjacent to one another, or by overlapping them." '518 Patent, Col.3:19–22 (JA0253). But the problem was that "oblique images are not grid aligned and can be captured from any direction," which means that "a feature on one image will not look the same on another image." '518 Patent, Col.3:26–28 (JA0253). To "allow continuous panning of oblique images," the alleged invention of the '518 Patent is to allow for the continuous panning of oblique images by overlapping adjacent oblique images that have common features. Thus, the claims recite a "primary oblique image including overlapping data" as a primary oblique image that is "adjacent" to a "secondary oblique image" and depicting "a first area" that "partially overlap[s]" with a "second area" depicted in the "adjacent secondary oblique image." '518 Patent, Claim 1 (JA0257); '518 Patent, Claims 13–16 (JA0258). And the words "oblique image" and "overlapping data" cannot be read out from the claims as EagleView appears to do. *See Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 909 (Fed. Cir. 2005) (reversing claim construction that read "substantially flattened" as "flat").

The specification of the '518 Patent confirms that Nearmap's construction is correct because the embodiments describe overlapping data between a primary oblique image and at least one adjacent oblique image; there is no embodiment that describes overlapping data between a primary oblique image and a non-adjacent oblique image. For example, Figure 2 of the '518 Patent illustrates the overlapping data between a primary image and an adjacent image:



'518 Patent, Fig. 2 (JA0248) (primary oblique image 102 annotated in orange and overlapping sections of secondary oblique images 104 annotated in blue); IPR 2022-00735, Aug. 5, 2022 Patent Owner's Prelim. Resp. at 6 (A607) (annotations added by EagleView). The specification explains that "the overlapping portions of the primary oblique image 102 and secondary oblique images 104a-d represent the same features of the area of interest." '518 Patent, Col.8:61–9:2 (JA0255). Thus, the primary oblique image includes common features with adjacent oblique images. In addition, Figure 3a shows overlapping data between a primary image and an adjacent image. IPR 2022-00735, Aug. 5, 2022 Patent Owner's Prelim. Resp. at 6 (A607). The Patent describes Figure 3a as "a pictorial representation of a primary oblique image and a secondary oblique image with an edge indicator consisting of a grayscale secondary oblique image and a Reference Indicator displayed." '518 Patent, Col.5:64–67 (JA0254); '518 Patent, Fig. 3a (JA0249). The reference indicator is a "visual effect that is used to indicate a common area of interest between two or more images." '518 Patent, Col.6:54–56 (JA0254). In Figure 3a, the reference indicator shows the common area of interest between primary oblique image 102 and secondary oblique image 104. *See* '518 Patent, Fig. 3a (JA0249).

The prosecution history supports Nearmap's construction. Pictometry added the claim term "the primary oblique image including overlapping data" to overcome a rejection based on

prior art (the Steedly reference) that Pictometry said did not teach "panning within a set of oblique images that overlap and represent an area of interest, as set forth in each of the independent claims 1, 13, 14, 15 and 16." *See* '518 File History, Sept. 9, 2011 Remarks at 12–13 (JA5243–44).  The Patent Office rejected the pending claims because Steedly taught that "a set of overlapping oblique images is joined to form a single seamless image of a scene." '518 File History, May 10, 2011 Office Action at 4 (JA5205).  Pictometry responded "any overlapping parts of the original images are not used in the final mosaic image [taught by Steedly], and the images formed by segmenting the final mosaic image do not overlap." '518 File History, Sept. 9, 2011 Remarks at 12 (JA5243).  The Patent Office allowed the amended claims as the "prior art of record fail[s] to teach/suggest instructions for panning within the primary oblique image, the primary oblique image including overlapping data." '518 File History, Notice of Allowance at 2 (JA5423).  This is a clear and unmistakable disclaimer of panning across non-overlapping oblique images. *Omega*, 334 F.3d at 1325–26.

8. **"the [first and second / plurality of] aerial images . . . taken independent[ly] of each other"** in all asserted claims of the '568 Patent; and claims 1, 2, 7, 21, 22, 24, 25 of the '961 Patent

| EagleView's Proposed Construction | Nearmap's Proposed Construction |
|---|---|
| no construction necessary | aerial images that were taken by a camera without a known spatial relationship to each other |

EagleView seeks to avoid construction of this term, apparently so that it can apply it to mean simply aerial images taken separately from each other, such as with different times, dates, or views.  But this is contrary to the intrinsic evidence, most significantly EVT's own statements made about the purported invention during reexamination of the '436 Patent (the parent of the '961 Patent and grandparent of the '568 Patent), which is part of the prosecution histories of the

'568 and '961 Patents.[7]  *See Realtime Data*, 554 F. App'x at 933–34 (affirming construction that

relied on sworn statements of patentee in related patent reexaminations).  There, EVT repeatedly,

consistently, and exclusively described aerial images "taken independently of each other" as

aerial images without camera data, such as the position of the camera when the aerial image was

taken.  For example:

- EVT argued that its purported invention is distinguishable over prior art that uses stereoscopic pairs of images to measure roofs, explaining that "[t]he images in a stereoscopic pair are *not taken independently* of each other, as they include geometric image data and parameter data that *contain highly detailed information on the camera angle of the image pairs with respect to each other*." '436 Reexamination, Oct. 25, 2013 Reply to Office Action at 14 (A059) (emphasis added).  EVT later repeated this argument, further distinguishing independently taken images from images taken at different times and dates.  '436 Reexamination, Oct. 25, 2013 Reply to Office Action at 28 (A073).

- EVT also argued that the "use of such stereoscopic pairs of images and associated stereoscopic parameter data . . . *exclude[es] and teach[es] away from the use of images taken independent of each other*." '436 Reexamination, Oct. 25, 2013 Reply to Office Action at 28–29 (A073–74) (emphasis added).

- In an interview with the examiner to discuss the patentability of its claims, EVT provided a slide presentation in which it again described independent images as images with "camera locations *unknown*." '436 Reexamination, Oct. 25, 2013 Reply to Office Action at 10, Attachment 1 (A114) (emphasis in original).

- EVT also argued that "*the claimed invention of the '436 Patent* is directed to determining roof measurements of roofs in images that have disparate types of view of the roof . . . [that] do *not* have the *specific information about how the image was acquired and details about the camera position when the image was taken*." '436 Reexamination, Oct. 25, 2013 Reply to Office Action at 49–50 (A094–95) (emphases in original).

Further, in a declaration that EVT submitted to the Patent Office, Chris Pershing, one of

the named inventors, testified that "[w]hile the various image file libraries might include two or

_____

[7] That the pending reexamination claims for the '436 Patent did not recite "taken independently of each other" does not change the analysis given that the related patents share common subject matter with the claims being construed and indeed, the same specification as the patents here.

more images of the same house, taken at different angles, ***these were taken independent of each other and I would not be able to obtain any data about the location of the camera for each of the images***." '436 Reexamination, Oct. 25, 2013 Reply to Office Action at 14, Attachment 2 at 2 (A145) (emphasis added).  This led him to try to solve the problem of "whether, ***without being given specific information about how the image was acquired and details about the camera position when the image was taken***[,] it would be possible to determine the pitch of sloped roof sections." '436 Reexamination, Oct. 25, 2013 Reply to Office Action at 14, Attachment 2 at 2 (A145) (emphasis added).  So too, during prosecution of the related '960 Patent, which presented pending claims reciting the term "the plurality of aerial images having been taken independent of each other," '960 File History, Nov. 10, 2016 Claims at 8–12 (JA2139–43), EVT explained that such images are not images in which the cameras have been "calibrated to each other" or images that are "stereoscopic pairs," '960 File History, Nov. 10, 2016 Remarks at 23 (JA2154); *see id.*, May 26, 2017 Claims at 2–7 (JA2350–55); *id.*, May 26, 2017 Remarks at 18–19 (JA2366–67).[8]

## III.    CONCLUSION

For the foregoing reasons, Nearmap respectfully requests the Court adopt its proposed claim constructions.

---

[8] EVT later amended its claims to remove this limitation to overcome a prior art rejection, but EVT reserved its rights to pursue the full scope of its prior claims in a subsequent related patent application.  '960 File History, Dec. 21, 2017 Remarks at 9 (JA2459).  EVT then pursued the claims in a later application that resulted in the '568 and '961 Patent claims.

Submitted this 27th day of January, 2023

By:  /s/ Brent O. Hatch
    Brent O. Hatch
    HATCH LAW GROUP, PC

    Nicholas Groombridge
    Jennifer H. Wu
    Jenny C. Wu
    Jennifer Rea Deneault
    Scott E. Miller
    Timothy J. Beavers
    GROOMBRIDGE, WU,
      BAUGHMAN & STONE LLP
    565 Fifth Avenue, Suite 2900
    New York, New York 10017
    332-269-0030 (telephone)
    nick.groombridge@groombridgewu.com
    jennifer.wu@groombridgewu.com
    jenny.wu@groombridgewu.com
    jenna.deneault@groombridgewu.com
    scott.miller@groombridgewu.com
    timothy.beavers@groombridgewu.com

    *Attorneys for Defendant Nearmap US, Inc.*