Juliette P. White, USB #9616
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:  801.532.1234
Facsimile:  801.536.6111
JWhite@parsonsbehle.com
ecf@parsonsbehle.com

*Attorney for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| EAGLE VIEW TECHNOLOGIES INC., PICTOMETRY INTERNATIONAL CORP., <br><br> Plaintiffs, <br><br> vs. <br><br> NEARMAP US, INC., <br><br> Defendant. | **PLAINTIFFS' OPENING MARKMAN BRIEF** <br><br> Case No. 2:21-cv-00283-TS-DAO <br><br> The Honorable Ted Stewart <br><br> Magistrate Judge Daphne A. Oberg |

# TABLE OF CONTENTS

I.      Introduction ................................................................................................................1

II.     Principles of Claim Construction .............................................................................1

III.    Background of the Technology and the Asserted Patents ..................................3

        A.      The '960, '568, and '961 Patents .........................................................4

        B.      The '152, '737, and '149 Patents ..........................................................5

        C.      The '518 Patent ...................................................................................5

        D.      The '880 Patent ...................................................................................6

IV.     Disputed Claim Terms ...........................................................................................7

        A.      The *Roof Report* Terms Do Not Require Explicit Construction .............................7

        B.      The *Aerial Image* Terms Do Not Require Explicit Construction .........................12

        C.      "*Oblique Image(s)*" Does Not Require Explicit Construction ..............................14

        D.      The *Calibration* Terms Do Not Require Explicit Construction ...........................15

        E.      The *Visual Marker* Limitation Does Not Require Explicit Construction .............17

        F.      The *3D Model* Terms Do Not Require Explicit Construction ..............................19

        G.      The *Overlapping Data* Limitation Does Not Require Explicit Construction ........22

        H.      The *Perspective* Limitation Does Not Require Explicit Construction...................23

        I.      The *Independent of Each Other* Limitation Does Not Require Explicit
                Construction .........................................................................................24

V.      Conclusion ...........................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012) ........................................................................ 2

*ArcelorMittal France v. AK Steel Corp.*,
   700 F.3d 1314 (Fed. Cir. 2012) ........................................................................ 3

*Arctic Cat Inc. v. GEP Power Prods., Inc.*,
   919 F.3d 1320 (Fed. Cir. 2019) ........................................................................ 7

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
   672 F.3d 1335 (Fed. Cir. 2012) ........................................................................ 7

*Aventis Pharm. Inc. v. Amino Chems. Ltd.*,
   715 F.3d 1363 (Fed. Cir. 2013) ........................................................................ 1

*Avid Tech., Inc. v. Harmonic, Inc.*,
   812 F.3d 1040 (Fed. Cir. 2016) ................................................................ 11, 15

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
   289 F.3d 801 (Fed. Cir. 2002) .......................................................................... 7

*Comark Commc'ns, Inc. v. Harris Corp.*,
   156 F.3d 1182 (Fed. Cir. 1998) ........................................................................ 2

*EdiSync Systems, Inc. v. Centra Software, Inc.*,
   No. 03-cv-1587, 2012 WL 2196047 (D. Colo. 2012).......................................... 2

*Enercon GmbH v. Int'l Trade Comm'n*,
   151 F.3d 1376 (Fed. Cir. 1998) ...................................................................... 11

*Kara Tech. Inc. v. Stamps.com Inc.*,
   582 F.3d 1341 (Fed. Cir. 2009) ............................................................ 16, 19, 21

*Liebel–Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004) ............................................................ 10, 14, 17

*Lisle Corp. v. A.J. Mfg. Co.*,
   398 F.3d 1306 (Fed. Cir. 2005) ...................................................................... 13

*Omega Engineering, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003) ................................................................ 14, 24

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........................................................ passim

*Rsch. Corp. Techs. v. Microsoft Corp.*,
    627 F.3d 859 (Fed. Cir. 2010) ............................................................................ 12

*Summit 6, LLC v. Samsung Elec. Co., Ltd.*,
    802 F.3d 1283 (Fed. Cir. 2015) ............................................................................ 2

*SynQor, Inc. v. Artesyn Techs., Inc.*,
    709 F.3d 1365 (Fed. Cir. 2013) ............................................................................ 3

*Thorner v. Sony Computer Ent. Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ............................................................................ 24

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ......................................................................... 2, 9

## I.      INTRODUCTION

While the patents-in-suit are groundbreaking, they do not use complicated technical terminology or otherwise alter defined terms in a manner different from their plain and ordinary meaning. Accordingly, Plaintiffs Eagle View Technologies, Inc. ("EagleView") and Pictometry International Corp. ("Pictometry") respectfully submit that no term of any of the Asserted Patents[1] requires construction because the plain and ordinary meaning of the terms would be readily understandable to a person of ordinary skill in the art at the time of the invention. Defendant Nearmap US, Inc. ("Nearmap"), on the other hand, has proposed 9 claim terms for construction in a legally impermissible attempt to narrow the claims to avoid infringement. Plaintiffs respectfully request that the Court reject Nearmap's attempt to construe the readily understandable claim terms at issue here.

## II.     PRINCIPLES OF CLAIM CONSTRUCTION

Claim construction begins with the words of the claim itself, and there is a "heavy presumption" that they receive their ordinary and customary meaning. *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013). "[O]rdinary and customary" corresponds to the meaning as understood by a person of ordinary skill in the art at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). As the Federal Circuit has explained, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."

---

[1] Plaintiffs assert infringement of U.S. Pat. No. 10,528,960 ("the '960 Patent"), U.S. Pat. No. 9,514,568 ("the '568 Patent"), U.S. Pat. No. 8,670,961 ("the '961 Patent"), U.S. Pat. No. 8,542,880 ("the '880 Patent"), U.S. Pat. No. 9,135,737 ("the '737 Patent"), U.S. Pat. No. 8,209,152 ("the '152 Patent"), U.S. Pat. No. 8,593,518 ("the '518 Patent"), and U.S. Pat. No. 10,685,149 ("the '149 Patent"), collectively the "Asserted Patents."

*Id.* at 1316 (quotations omitted). In some instances, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. Accordingly, a court need not construe every term. *Summit 6, LLC v. Samsung Elec. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015) ("Because the plain and ordinary meaning of the disputed claim language is clear, the district court did not err by declining to construe the term."); *ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012) ("The district court did not err in concluding that these terms have plain meanings that do not require additional construction."); *EdiSync Systems, Inc. v. Centra Software, Inc.*, No. 03-cv-1587, 2012 WL 2196047, at *13-14 (D. Colo. 2012) (finding the phrase "given computer file" needed no construction because it was comprised of easily understood terms and it possessed a clear meaning in the context of the patent).

Intrinsic evidence is "the most significant source of the legally operative meaning of disputed claim language." *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996). "Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp*., 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quotations omitted); *see also Phillips*, 415 F.3d at 1323.

"In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term[, and] it is improper to rely on extrinsic evidence." *Vitronics*, 90 F.3d at 1583. Further, extrinsic evidence "may not be 'used to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'" *ArcelorMittal France v. AK Steel Corp*., 700 F.3d

1314, 1320 (Fed. Cir. 2012) (quoting *Phillips*, 415 F.3d at 1324). Finally, "[a] claim construction

that excludes the preferred embodiment is rarely, if ever, correct." *SynQor, Inc. v. Artesyn Techs.,*

*Inc.*, 709 F.3d 1365, 1378-79 (Fed. Cir. 2013) (quotations omitted).

## III.    BACKGROUND OF THE TECHNOLOGY AND THE ASSERTED PATENTS

EagleView, launched in 2008, was the first remote aerial roof measurement service. Since

then, it has continued to develop technology that produces aerial roof and wall measurement

reports that are used, *e.g.*, to estimate the costs of roof repairs, construction, solar installation, and

insurance claims. EagleView is the owner of all pertinent rights to six of the Asserted Patents: the

'152, '737, '149, '960, '961, and '568 patents. As explained in the background section of the '960

patent, for example, roofing contractors need to provide assessments of roofs for estimation and

planning purposes, which traditionally would have required the contractors to visit the site of the

building, take measurements, and inspect the area. JA0085 ('960 Patent, 1:23-32). Such site visits

are costly and time-consuming. *See id.* at 1:33-57. EagleView revolutionized the roofing industry

by developing roof estimation systems and methods that eliminate the need for such site visits.

Pictometry, founded in 1996, is an innovator of, *e.g.*, aerial oblique image capture and

processing techniques. Pictometry is the owner of all pertinent rights to two of the Asserted

Patents: the '518 and '880 patents. The '518 patent is directed to a computer system for continuous

panning of oblique images, while the '880 patent is directed to technology for more precisely

identifying a location of a building's roof structure, using a moveable marker, and then providing

additional oblique imagery of the precise location identified. JA0243 ('518 Patent, Abstract);

JA0261 ('880 Patent, Abstract).

### A.      The '960, '568, and '961 Patents

The '960, '568, and '961 patents are related patents, each of which traces its lineage back to the same provisional application. The '568 and '961 patents share a common specification, whereas the specification of the '960 patent is shorter. The patents are directed to roof estimation systems and methods for generating roof reports. According to an embodiment of these patents, a roof company enters the customer's address into a software program and aerial images of the building are presented to the roof company. The roof company uses the technology to determine the slopes, dimensions, and other relevant geometric information of the roof sections on the buildings. From these determinations, the overall shape, slopes and square footage of the roof sections are determined, and a report is output. JA0085 ('960 Patent, 2:16-37).

Figures 5A and 5C, reproduced below, illustrate an example of pages of a type of roof report associated with the building shown to the left in Figure 5A. *See e.g.,* JA0086 ('960 Patent, 3:50-52). In particular, Figure 5A shows an aerial image of two buildings (one of which is the building for which the report was ordered), and Figure 5C shows a line drawing of the roof of the building on the left, showing features of the roof and associated length measurements. JA0087 ('960 Patent, 5:33-49).



4

**B.  The '152, '737, and '149 Patents**

The '152, '737, and '149 patents are related and share a common specification. While these patents are similarly directed to roof estimation systems and methods, their focus is more on aspects of a user interface configured to facilitate the generation of roof models. All of the claims of the '737 and '149 patents include limitations relating to the generation and output of roof estimate reports, while the generation of a roof estimate report is referenced in one of the dependent claims of the '152 patent.[2]

**C.  The '518 Patent**

The '518 patent is directed to a computer system for continuous panning of oblique images that "uses a methodology whereby separate oblique images are presented in a manner that allows a user to maintain an understanding of the relationship of specific features between different oblique images when panning." JA0243 ('518 Patent, Abstract); *see also* JA0252 ('518 Patent, 1:22-3:57). The '518 Patent details a methodology for continuous panning of oblique images that includes determining a primary oblique image, determining at least one adjacent secondary oblique image, and displaying the primary oblique image and the secondary oblique image(s) on the same display. JA0243 ('518 Patent, Abstract); JA0253-54 ('518 Patent, 3:55-5:54); JA0256-58 ('518 Patent 9:34-12:8, 12:18-14:64). Figure 3b of the '518 patent, reproduced and annotated below, provides a pictorial representation of a primary oblique image 102 and a secondary oblique image 104 with an edge indicator (identifying the edge of the primary oblique image 102) and a reference

---

[2] Each of the non-limiting preambles of the '152 patent refers to the generation of a roof estimate report, as well.

indicator 209 (identifying the location common to the two images). JA0254 ('518 Patent, 5:64-6:2); JA0257 ('518 Patent, 11:49-61).



*Fig. 3b*

### D.    The '880 Patent

The '880 Patent is directed to "processes and systems ... for determining attributes of a roof structure of real-world three-dimensional building(s)" through the "use of aerial imagery." JA0261 ('880 Patent, Abstract); JA0283 ('880 Patent, 1:13-15). The process claimed by the '880 patent begins by providing a "computer input field for a user to input first location data generally corresponding to the location of the building." JA0264 ('880 Patent, Fig. 3); JA0287 ('880 Patent, 9:50-58); JA0289-90 ('880 Patent, claims 1 and 14). The next step uses the location of the building identified in the first step to provide "visual access to an aerial image of a region including the roof structure." JA0287 ('880 Patent, 9:58-10:2); JA0289-90 ('880 Patent, claims 1 and 14). A "visual marker initially corresponding to [the] first location data" is also displayed. JA0287 ('880 Patent, 10:2-6); JA0289-90 ('880 Patent, claims 1 and 14). In the next step, the "visual marker may be moved to a final location on top of the building" by the user. JA0287 ('880 Patent, 10:6-12); JA0289-90 ('880 Patent, claims 1 and 14). The process then provides "a computer input capable of signaling user-acceptance of the final location of said marker" so the user can accept the final

location. JA0287 ('880 Patent, 10:12-15); JA0289-90 ('880 Patent, claims 1 and 14). The final step is "providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location." JA0283 ('880 Patent, 1:33-56); JA0287 ('880 Patent, 10:17-11:19); JA0289-90 ('880 Patent, claims 1 and 14).

## IV.    DISPUTED CLAIM TERMS

### A.    The *Roof Report* Terms Do Not Require Explicit Construction

| Terms | "roof report" / "roof estimate report"[3] |
|---|---|
| **Claims** | '960, '568, '961, '737, '152,[4] '149 patents, all asserted claims |
| **Plaintiffs' Proposed Construction** | No construction is necessary because the plain and ordinary meaning would have been clear to one of ordinary skill in the art. |
| **Defendant's Proposed Construction** | ORIGINAL: An electronic file or paper document created by transforming the generated model and/or the determined roof measurement information, such as the sizes, dimensions, slopes, and orientations of the roof sections of a building roof, and not simply displaying the model or roof measurement information itself. Roof measurement information includes "lengths of edges, pitches, and areas of a section of a roof." <br><br> 1/19/2023 REVISION: an electronic file or paper document transformed from a roof model and/or determined roof measurements that graphically shows a representation of the roof model and/or determined roof measurements |

_____

[3] For convenience, these terms will collectively be referred to herein as the "Roof Report Terms."

[4] The '152 patent only includes the phrase "roof estimate report" in its non-limiting preamble, and it is therefore not a limitation of the asserted claims.  *See Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1347 (Fed. Cir. 2012) ("This court has recognized that as a general rule preamble language is not treated as limiting."); *see also Arctic Cat Inc. v. GEP Power Prods., Inc.*, 919 F.3d 1320, 1327 (Fed. Cir. 2019); *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808–09 (Fed. Cir. 2002).

The Roof Report Terms do not require construction. *Phillips*, 415 F.3d at 1312-13. Starting with the claims, there is an explicit recitation of the contents of roof reports and roof estimation reports, such that no construction is required. For example, the various claims of these patents literally tell a person of ordinary skill what must, at least, be included in the claimed roof reports / roof estimation reports:

- '960 Patent, Claim 1: "a roof report . . . includes the pitch and the area of the one or more roof sections . . . wherein the roof report is useful as a guide to repair or replace the roof of the building," JA0088 (8:4-12);

- '568 Patent, Claim 6: "a roof estimate report … includes at least one top plan view of the three-dimensional model annotated with numerical indications of the determined pitch and the direction of the pitch," JA0063 (17:49-52);

- '961 Patent, Claim 1: "the roof report includes one or more top plan views of a model of the roof annotated with numerical values that indicate a corresponding pitch, area, and length of edges of at least some of the plurality of roof sections….", JA0030 (16:19-24);

- '737 Patent, Claim 1: "the roof estimate report includes numerical values for corresponding slope, area, or lengths of edges of at least some of a plurality of planar roof sections of the roof, wherein the generated roof estimate report is provided for repair and/or constructing the roof structure of the building," JA0186 (24:13-19);

- '149 Patent, Claim 1: "the roof estimate report includes numerical values annotated with corresponding slope, pitches, total area of the roof, identification and measurement of ridges and valleys of the roof, different elevation views … of the roof, and lengths of corresponding roof section for each line segment of edges of a plurality of planar roof sections of the roof, wherein the generated roof estimate report is provided for repair or construction of a corresponding roof structure of the building," JA0240-41 (24:66-25:8);

Nearmap proposes a lengthy construction (which it has already revised) for a simple two- or three-word phrase. This proposal improperly attempts to narrow the meaning of the Roof Report Terms in at least the following ways: (1) it improperly confines the format of the roof reports to either an "electronic file or paper document"; and (2) it improperly limits the manner in which the

reports are created by specifying a particular process—*i.e.*, by requiring that the roof reports are

"transformed from" a roof model and/or roof measurements. The Federal Circuit has repeatedly

warned against constructions that exclude preferred embodiments or that, absent a specific

definition in the specification or prosecution disclaimer, deviate from the plain and ordinary

meaning as would be understood by a person of ordinary skill in the art. *PPC Broadband, Inc. v.

Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 755 (Fed. Cir. 2016) ("We have often

remarked that a construction which excludes the preferred embodiment is 'rarely, if ever correct.'"

(quoting *Vitronics*, 90 F.3d at 1583)); *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir.

2008) ("[W]here claims can reasonably [be] interpreted to include a specific embodiment, it is

incorrect to construe the claims to exclude that embodiment, absent probative evidence on the

contrary.").

First, as to the format of the reports, limiting the term "report" to either an electronic file

or paper document would artificially limit ***all independent claims*** and exclude the preferred

embodiments described in the at-issue patents. The specification describes various formats of

reports that, contrary to Nearmap's proposed construction, are not limited to either an electronic

file or paper document. For example, the patents explain:

- "The roof estimate report may be in ***an electronic <u>format</u>*** (e.g., a PDF file) and/or paper format (e.g., a printed report). In some embodiments, ***the roof estimate report may be in a format that may be consumed by a computer-aided design program***."[5] JA0126 ('152 Patent, 8:28-32); JA0178 ('737 Patent, 8:20-22); JA0232 ('149 Patent, 8:56-60).

- "In other embodiments, ***more or less information may be provided, or the illustrated information may be arranged in different ways***. For example, ***the report may be provided in electronic form***, such as a PDF file ***or a computer aided design software format***. In some embodiments, ***the report may be "active" or editable***, such that the

---

[5] Unless otherwise noted, all emphasis in quotations has been added.

> user of the report may make changes to the report, based on on-site observations."
> JA0127 ('152 Patent, 9:9-15); JA0179 ('737 Patent, 9:1-7); JA0233 ('149 Patent, 9:38-45).

Thus, there is no requirement that the report must be either an electronic file or paper format report. The exemplary statement that the "roof estimate report may be in an electronic format" is expansive, not limiting. Further, there is no requirement that a roof report / roof measurement report be comprised of a single file. There are innumerable "electronic format[s]" or "electronic forms" that are more expansive than a single PDF file, including a compilation of files that constitute the report.[6] And, even if the only example of a roof report in the patent specifications were a PDF file or a printed report, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

Second, as to how the reports are created, Nearmap's proposed construction requires that the roof reports are "***transformed*** from a roof model and/or determined roof measurements." There is no such requirement in the specification. For example, the patents explain:

- "In step 804, ***the routine prepares (e.g., generates, determines, produces, etc.)*** and transmits ***a roof estimate report*** that includes one or more annotated top-down views of the three-dimensional model." JA0061 ('568 Patent, 14:39-43); JA0029 ('961 Patent, 14:28-31).

- "An estimation service associated with the website uses the address information to obtain the images of the roof sections on the building(s) and uses the roof estimation

---

[6] Similarly, the '880 patent explains that a report can be printed, provided in a PDF file, "or otherwise, illustrated on a computer screen for the user to print out (web based or otherwise) and/or delivered on recordable media such USB drive, floppy disk, CD, DVD, email attachment or otherwise," and preferably "delivered as an interactive computer file." JA0286 ('880 Patent, 7:28-35). Moreover, the same patent explains that reports can be "one or more pages or screen shots, or both." JA0284 ('880 Patent, 4:26-29).

> software program and calibration module to determine the relevant geometry, pitch
> angles, dimensions, and surface areas of the building's roof. The service then ***produces***
> and sends a report to the roof company." JA0085 ('960 Patent, 2:46-52); *see also*
> JA0085 ('960 Patent, 2:28-34) ("a report is produced"); JA0086 ('960 Patent, 4:9-16)
> ("prepare a preliminary report"); JA0086 ('960 Patent, 4:45-48) ("create a preliminary
> report").

Thus, there is no requirement that the report must be created by being ***transformed*** from a roof

model and/or determined measurements.

And while the specification of the '961 patent notes that "3D models" may be provided to

a customer "without first being ***transformed into*** a report," JA0027 ('961 Patent, 10:38-44), it is

improper to read in extraneous limitations from the specification. *Enercon GmbH v. Int'l Trade*

*Comm'n*, 151 F.3d 1376, 1384 (Fed. Cir. 1998) ("This court has repeatedly stated that while claims

are to be construed in light of the specification, they are not necessarily limited by the

specification."). Nowhere does the specification say that the report is transformed from the 3D

model.

Further, Nearmap's proposed construction introduces unnecessary ambiguity where no

such ambiguity previously existed, including as to the meaning of "transformed" and "graphically

shows a representation of the roof model and/or determined roof measurements." For example, the

Asserted Patents never speak of "transforming" measurements, as referenced in Nearmap's

proposed construction, and it is unclear what that means. These phrases will undoubtably confuse

the jury instead of advancing the goal of claim construction, which is "to give the finder of fact an

understandable interpretation of claim scope to apply to the accused systems." *Avid Tech., Inc. v.*

*Harmonic, Inc.*, 812 F.3d 1040, 1050 (Fed. Cir. 2016).

Moreover, Nearmap's proposed addition of process limitations is improper for an

additional reason. Not all of the asserted claims that include the Roof Report Terms are method or

process claims, but Nearmap seeks to import a process limitation to system and computer-readable medium ("CRM") claims. *See, e.g.*, JA0063-64 ('568 Patent, 17:5-20:43); JA0030-31, ('961 Patent, 15:60-17:47); JA0187 ('737 Patent, 25:6-25:43); JA0134-35 ('152 Patent, 24:58-26:42); JA0241 ('149 Patent, 25:47-26:50). Importing process limitations to an apparatus claim, such as a system or CRM claim, is highly disfavored. *Rsch. Corp. Techs. v. Microsoft Corp.*, 627 F.3d 859, 873 (Fed. Cir. 2010) ("Courts must generally take care to avoid reading process limitations into an apparatus claim . . . Thus, [the] claim [] is not limited to any particular process or method of making the claimed blue noise mask.") (quotation omitted).

### B.     The *Aerial Image* Terms Do Not Require Explicit Construction

| Terms | "aerial image(s)" / "aerial image file(s)"[7] |
|---|---|
| Claims | '960, '568, '961, '737, '152, '149 patents, all asserted claims |
| Plaintiffs' Proposed Construction | No construction is necessary because the plain and ordinary meaning would have been clear to one of ordinary skill in the art. |
| Defendant's Proposed Construction | Photograph taken from the air by a camera |

The Aerial Image Terms do not require an explicit claim construction; rather they are easily understood according to their plain and ordinary meaning without any construction. *Phillips*, 415 F.3d at 1312-13. These words are plain English that a factfinder can readily apply. For example, "image" is a widely used word, which Nearmap itself uses in its proposed construction for "oblique image(s)." Given the commonsense nature of the Aerial Image Terms, there is simply no reason

---

[7] For convenience, "aerial image(s)" and "aerial image file(s)" as used in the '960, '568, '961, '737, '152, and '149 patents will collectively be referred to herein as the "Aerial Image Terms." The parties have agreed to the construction of "aerial image" and "aerial imagery" for the '880 patent.

for the Court to construe them. *Lisle Corp. v. A.J. Mfg. Co.*, 398 F.3d 1306, 1314 (Fed. Cir. 2005) (rejecting defendant's proposed construction and "instead rely[ing] on the patent specification to attain a common-sense meaning of [the] claim limitation.").

However, even if the Court did construe the Aerial Image Terms, Nearmap's proposed construction is improperly limiting because it requires that the images be "photographs" taken by "a camera." The Asserted Patents use the Aerial Image Terms consistent with their plain and ordinary meaning, for example, explaining that "aerial image files 54 may be taken [by] any available means, such as a manned or unmanned aircraft, a balloon, a satellite, etc." and that in "some embodiments, the aerial image files may include *images* taken from a ground-based platform, such as a mobile ('street view') photography vehicle, a fixed position (e.g., a tower, nearby building, hilltop, etc.), etc." JA0056 ('568 Patent, 3:67-4:6); *see also* JA0230 ('149 Patent, 4:22-31); JA0124 ('152 Patent, 4:1-10); JA0023 ('961 Patent, 2:4-14); JA0176 ('737 Patent, 3:57-4:2). The '880 patent similarly explains that the term "aerial imagery," consistent with its plain and ordinary meaning, means "*pictures*, normally including photographs (visual light, infrared, color, black and white, or otherwise) taken from an overhead view (straight down, oblique, or otherwise) with respect to a building roof. This *may include imagery* taken from airplanes, satellites, balloons, or otherwise." JA0283 ('880 Patent, 2:54-59); *see also, e.g.*, JA0252 ('518 Patent, 1:28-29) (referring to "sensor" as an alternative to "camera").

Notably, none of the Asserted Patents that involve the Aerial Imagery Terms limit an "aerial image" to an "aerial photograph," as Nearmap seeks to do. For example, such limitation would read out the use of aerial images derived from other types of sensors/processing techniques. Such a limiting claim construction of the Aerial Image Terms would be improper; even if the

13

specifications only describe example embodiments that use aerial photographs. *See Liebel-Flarsheim*, 358 F.3d at 913.

### C.    **"*Oblique Image(s)*" Does Not Require Explicit Construction**

| Terms | "oblique image(s)" |
|-------|-------------------|
| **Claims** | '518 patent, all asserted claims |
| **Plaintiffs' Proposed Construction** | No construction is necessary because the plain and ordinary meaning would have been clear to one of ordinary skill in the art. |
| **Defendant's Proposed Construction** | An image captured at an angle that is still in the original form the camera captured and has not been re-projected into a mathematical model. |

The phrase "oblique image(s)" does not require an explicit claim construction; rather it is easily understood according to its plain and ordinary meaning without any construction. *Phillips*, 415 F.3d at 1312-13. These words are plain English and not ambiguous. Given the commonsense nature of "oblique image(s)," there is simply no reason for the Court to construe the phrase. *Lisle Corp.*, 398 F.3d at 1314.

Nearmap's proposed construction improperly seeks (1) to import requirements from the specification—*i.e.*, that the image be captured by a camera, and (2) to add a negative limitation—*i.e.*, that the image cannot have been re-projected into a mathematical model. *See Liebel-Flarsheim*, 358 F.3d at 913; *see also Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1322 (Fed. Cir. 2003) (refusing to import a negative limitation through claim construction where the "additional negative limitation finds no anchor in the explicit claim language"). With respect to the latter, Nearmap's proposed construction injects further ambiguity through the phrase "re-projected into a mathematical model." This ambiguity will undoubtably confuse the jury instead

of advancing the goal of claim construction, which is "to give the finder of fact an understandable interpretation of claim scope to apply to the accused systems." *Avid Tech.*, 812 F.3d at 1050.

The '518 patent explains in the Background section that there are two basic categories of images relevant to the "remote sensing/aerial imaging industry." JA0252 ('518 Patent, 1:20-27). The '518 patent explains the first category as "Captured Imagery—these images have the appearance they were captured by the camera or sensor employed," and the second category as "Projected Imagery—these images have been processed and converted such that they conf[o]rm to a mathematical projection." JA0252 ('518 Patent, 1:28-32). The '518 patent further explains that all "imagery starts as captured imagery, but as most software cannot geo-reference captured imagery, that imagery is then reprocessed to create the projected imagery." JA0252 ('518 Patent, 1:33-35).

Nearmap's proposed construction of the term "oblique image" seeks to limit the term "image" to "captured imagery" by a camera (but, inexplicably, not a sensor) and to exclude "projected imagery." Because the term "image" is a widely used and commonly understood English word, it should be given its plain and ordinary meaning without any construction. *Phillips*, 415 F.3d at 1312-13

> **D.    The *Calibration* Terms Do Not Require Explicit Construction**

| Terms | "calibrating" / "calibrate" / "calibrated"[8] |
|---|---|
| Claims | '960, '568, '961 patents, all asserted claims |
| Plaintiffs' Proposed Construction | No construction is necessary because the plain and ordinary meaning would have been clear to one of ordinary skill in the art. |

---

[8] For convenience, these terms will collectively be referred to herein as the "Calibration Terms."

| | |
|---|---|
| **Defendant's Proposed Construction** | ORIGINAL: Converting the distance in pixels between two points on the image into a physical length after the aerial image is received by a roof estimation software program.<br><br>1/19/2023 REVISION: converting the distance in pixels between two points on an aerial image into a physical length using image scale information after the aerial image and image scale information is received by roof measurement software |

The Calibration Terms do not require an explicit claim construction; rather they are easily understood according to their plain and ordinary meaning without any construction. *Phillips*, 415 F.3d at 1312-13.

Nearmap, however, improperly seeks to limit the Calibration Terms to a preferred embodiment, presumably from the following recitation in the specification of the '568, '961, and '960 patents:

> Once the images of the roof section of the building are obtained, at least one of the images may be calibrated. During calibration, the distance in pixels between two points on the image is converted into a physical length. This calibration information is typically presented as a scale marker on the image itself, or as additional information supplied by the image database provider along with the requested image.

JA0057 ('568 Patent, 6:43-50); JA0025 ('961 Patent, 6:44-50); JA0087 ('960 Patent, 6:3-10).

But the patents explain that this is "***one example embodiment***." JA0057 ('568 Patent, 6:18-20); JA0025 ('961 Patent, 6:18-20). And the claims of these patents do not require that calibration be performed in the specific manner that Nearmap suggests. *See, e.g.*, JA0062-64 ('568 patent), JA0030-32 ('961 patent). It is well established that embodiments are not to be read into the claims. *See Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or

import a limitation from the specification into the claims."); *Liebel-Flarsheim*, 358 F.3d at 913. Nothing about the plain and ordinary meaning of "calibrate" suggests anything about the distance between two pixels in an image or converting that into a physical length, or that such a conversion must be done "using image scale information after the aerial image and image scale information is received by roof measurement software." It is legally impermissible to import or mix and match concepts or language from other claim terms or the specification (absent a clear definition).

### E.    The *Visual Marker* Limitation Does Not Require Explicit Construction

| Terms | "providing a visual marker that is moveable on a computer monitor around said region, said visual marker initially corresponding to said first location data, wherein said visual marker may be moved to a final location on top of the building to more precisely identify the location of the building roof structure, the final location having location coordinates"[9] |
|---|---|
| Claims | '880 patent, all asserted claims |
| Plaintiffs' Proposed Construction | No construction is necessary because the plain and ordinary meaning would have been clear to one of ordinary skill in the art. |
| Defendant's Proposed Construction | Providing a shape, pointer, label, icon, avatar or other indicator that initially corresponds to the first location data input by the user, and that is draggable on a computer monitor from its initial location to a final location on top of a building to more precisely identify the location of the building structure corresponding to the first location data. |

The Visual Marker limitation does not require an explicit claim construction; rather it is easily understood according to its plain and ordinary meaning without any construction. *Phillips*, 415 F.3d at 1312-13.

---

[9] For convenience, this claim phrase will be referred to herein as the "Visual Marker Limitation."

Nearmap has again improperly endeavored to import limitations from the specification into the claim by, for example, changing the phrase "that is moveable" to "that is draggable."

The '880 patent does not support Nearmap's proposed narrowing. For context, the '880 explains that an "optional feature is to provide for user acceptance of the final location of a roof structure." JA0287 ('880 Patent, 9:50-10:23). Upon looking up a street address, the software retrieves imagery associated with the address, along with a "marker 106 a is shown . . . corresponding to the street address. . . . [W]hile marker 106 a is close to roof structure 501, it does not directly or perfectly correspond to roof structure 501. As such, the customer or other user ***may be allowed to move the marker (by click and dragging via computer mouse, <u>arrows, or otherwise</u>***) to a final location 106 b as depicted in FIG. 4C . . . [to] more precisely identif[y] the location of the building roof structure 501 to be measured." *Id*. The movement of the marker 106 from location 160 a to location 106 b is illustrated in the annotated excerpt for Figures 4B and 4C below.

 

JA0266-67 ('880 Patent, figures 4B, 4C) (annotated excerpts).

The plain language of the specification—which states that "the customer … may be allowed to move the marker (by … arrows, or otherwise) to a final location"—explicitly provides another example of how the marker may be moved (*i.e.*, by arrows). Moreover, such language indicates that movement by "clicking and dragging via computer mouse" or by "arrows" are not the only ways that the marker may be moved given the general reference that the marker may also

be moved "*otherwise*." Nearmap's improper attempt to import limitations from the specification should be rejected. *Kara Tech.*, 582 F.3d at 1348.

Nearmap's proposed construction also (1) replaces the simple, commonly understood term "visual marker" with an open-ended list ("shape, pointer, label, icon, avatar or other indicator") that is unhelpful and unnecessary, and (2) omits the claim language "the final location having location coordinates," which is another reason why its proposed construction should be rejected for the plain and ordinary meaning of the claim phrase.

### F.    The *3D Model* Terms Do Not Require Explicit Construction

| Terms | "three-dimensional model" / "3D model"[10] |
|---|---|
| **Claims** | '960, '568, '152, '149 patents, all asserted claims; '961 patent, claims 21, 24, 25; '737 patent, claims 10, 17, 25 |
| **Plaintiffs' Proposed Construction** | No construction is necessary because the plain and ordinary meaning would have been clear to one of ordinary skill in the art. |
| **Defendant's Proposed Construction** | ORIGINAL: A 3D model of a roof of a building that is generated based on aerial images showing portions of the roof, which is then utilized to determine roof measurement information such as lengths of the edges of sections of the roof, pitches of sections of the roof, areas of sections of the roof.<br><br>1/19/2023 REVISION: a three-dimensional representation of a building roof that is generated based on aerial images with different views of the roof, which provides roof measurement information such as length, pitch, and area of sections of the roof; |

The 3D Model Terms do not require an explicit claim construction. *Phillips*, 415 F.3d at 1312-13. The individual patents and asserted claims describe how the claimed three-dimensional model is created, what it contains, and how it is used. For example, '960 Patent, Claim 1 recites

---

[10] For convenience, these terms will collectively be referred to herein as the "3D Model Terms."

"constructing a three dimensional model of one or more roof sections" through four specific steps: (1) "calibrating … aerial images files … to convert a distance in pixels between two points … into a physical length"; (2) "identifying common reference points"; (3) "identifying … a location in three-dimensional space by triangulating the reference points"; and (4) "determining physical length between at least two of the reference points in three-dimensional space based at least in part on the calibration." JA0088 ('960 Patent, 7:38-8:3). As another example, '568 Patent, Claim 6 recites generating "a three-dimensional model of the roof that includes a plurality of planar roof sections that each have a corresponding pitch, area, and edges." JA0063 ('568 Patent, 17:40-44). As a third example, '149 Patent, Claim 1 (from which asserted Claim 3 depends) recites generating a roof estimate report that includes "different elevation views rendered from a 3D model of the roof." JA0241 ('149 Patent, 25:3-4). Thus, the respective scope of the claimed three-dimensional model is clear from the context of each claim in which the term appears.

This context also makes clear, however, that those things are not inherent requirements of the term "three-dimensional model" or "3D model" itself. Nearmap's attempt to import such requirements into the term would improperly narrow its meaning. Nearmap's original proposed construction did not even define "3D model"—it simply repeated that term and then tacked on specific narrowing requirements. Nearmap's new proposal at least replaces "model" with "representation," but changing "model" to "representation" is not particularly helpful; worse, the proposal still imports requirements that are separately stated in the claims. In particular, Nearmap's proposed construction of the 3D Model Terms would narrow the terms by (i) improperly limiting the terms to "aerial image" embodiments; (ii) improperly importing a requirement that the 3D

model generated be used in a specific manner; and (iii) improperly importing a process limitation to system and CRM claims.

First, the Asserted Patents explain various systems and methods for generating three-dimensional models. For example, the '149 patent explains that there "are a variety of photogrammetric algorithms that can be utilized to" generate a model of a roof of a building. JA0231 ('149 Patent, 5:30-40). The '149 patent further explains that one "such algorithm used by the RES 100 uses photographs taken from two or more view points to 'triangulate' points of interest on the object in three-dimensional ('3D') space." JA0231 ('149 Patent, 5:40-43). The same patent also explains that in "one embodiment, generating such a model is based at least in part on a correlation between at least two of the aerial images of the building." JA0230 ('149 Patent, 4:61-63). Nearmap's proposed construction is unduly narrow as it would have the Court read out all embodiments other than the "aerial image" embodiments. Kara Tech., 582 F.3d at 1348.

Second, Nearmap's proposed construction includes language setting forth limitations on how a 3D model is used after it is generated; i.e., that it must be "then utilized to determine roof measurement information such as lengths of the edges of sections of the roof, pitches of sections of the roof, areas of sections of the roof." But how a 3D model is used after it is generated does not make it a 3D model (or not). To the extent that how a 3D model is relevant to a particular claim, the inventor would have specified so in the claims. For example, claim 1 of the '568 patent recites "generating a roof estimate report that includes at least one top plan view of the three-dimensional model annotated with numerical indications of the determined pitch and the direction of the pitch." JA0062 ('568 Patent, 16:44-46). Nearmap's attempt at importing new claim limitations through claim construction should be denied.

Third, as with the Roof Report Terms, Nearmap again seeks to import a process limitation to system and CRM claims, which is highly disfavored. *See* Section IV.A.

### G.  The *Overlapping Data* Limitation Does Not Require Explicit Construction

| Terms | "primary oblique image including overlapping data"[11] |
|---|---|
| **Claims** | '518 patent, all asserted claims |
| **Plaintiffs' Proposed Construction** | No construction is necessary because the plain and ordinary meaning would have been clear to one of ordinary skill in the art. |
| **Defendant's Proposed Construction** | ORIGINAL: Primary image including common features with an adjacent oblique image.<br><br>1/19/2023 REVISION: primary oblique image including common features with an adjacent oblique image |

The Overlapping Data Limitation does not require an explicit claim construction. *Phillips*, 415 F.3d at 1312-13. The term is a straightforward statement using commonly understood words that a factfinder could readily apply.

There is no indication that the language of the Overlapping Data Limitation has a specialized meaning. In particular, the '518 patent uses the word "overlap" consistent with ordinary usage. For example, the '518 patent explains that continuous panning of images in a grid is possible "by simply displaying [oblique] images adjacent to one another, or by overlapping them." JA0253 ('518 Patent, 3:19-22). This allows for "users to remain oriented when navigating between images since the appearance and orientation of a road, building, or other feature remains very similar from one image to the next." JA0253 ('518 Patent, 3:22-25). The '518 patent further

---

[11] For convenience, this claim phrase will be referred to herein as the "Overlapping Data Limitation."

explains that "the secondary oblique images 104a-d overlap a portion of the primary oblique image 102, such that the overlapping portions of the primary oblique image 102 and secondary oblique images 104 a-d represent the same features of the area of interest." JA0255 ('518 Patent, 8:61-66).

Nearmap's proposed construction, which appears to substitute "common features" for the phrase "overlapping data" in the claim term, is neither helpful nor accurate. First, the claims use both "data" and "features," implying they mean different things and should not be conflated. Second, saying "common" instead of "overlapping" does not shed any further light on the meaning of the claim term, and EagleView submits that the two words have subtle differences in meaning that could mislead a factfinder. Accordingly, no construction is necessary.

### H.     The *Perspective* Limitation Does Not Require Explicit Construction

| Terms | "wherein the primary and secondary oblique images match the perspectives from which the primary and secondary oblique images were captured"[12] |
|---|---|
| **Claims** | '518 patent, all asserted claims |
| **Plaintiffs' Proposed Construction** | No construction is necessary because the plain and ordinary meaning would have been clear to one of ordinary skill in the art. |
| **Defendant's Proposed Construction** | Wherein the primary and secondary oblique images are displayed as captured and not re-projected, warped or distorted. |

The Perspective Limitation does not require an explicit claim construction. *Phillips*, 415 F.3d at 1312-13. The term is a straightforward statement using commonly understood words that a factfinder could readily apply.

---

[12] For convenience, this claim phrase will be referred to herein as the "Perspective Limitation."

Even if the Court were to construe the Perspective Limitation, Nearmap's proposed construction is unduly narrowing—instead of the images simply needing to "match the perspectives," Nearmap requires that they be displayed "as captured." And while the Perspective Limitation was added during prosecution and relied upon to distinguish the then pending claim over the prior art (*see* JA5285; JA5297) none of the applicant's statements during prosecution rise to the level of a clear and unmistakable disclaimer that would compel such a narrowing. The applicant merely criticized the prior art for constructing "a final mosaiced view of the scene . . . by warping and distorting input images." JA5297. The Federal Circuit has repeatedly held that "mere criticism of a particular embodiment is not sufficient to rise to the level of clear disavowal." *Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 798 (Fed. Cir. 2019) (quoting *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012)). Thus, Nearmap's proposed construction should be rejected.

Moreover, as with "oblique image(s)", Nearmap's proposed construction includes a negative limitation—that the images are "not re-projected, warped or distorted"—which must be rejected. *Omega Engineering*, 334 F.3d at 1322; *see also* Section IV.C.

I.     **The *Independent of Each Other* Limitation Does Not Require Explicit Construction**

| Terms | "the first and second aerial images / the plurality of aerial images . . . having been taken independent[ly] of each other / that were taken independent of each other"[13] |
|---|---|
| Claims | '568 patent, all asserted claims;<br>'961 patent, claims 1, 2, 7, 21, 22, 24, 25 |

---

[13] For convenience, these claim phrases will be referred to herein as the "Independent of Each Other Limitation."

| | |
|---|---|
| **Plaintiffs' Proposed Construction** | No construction is necessary because the plain and ordinary meaning would have been clear to one of ordinary skill in the art. |
| **Defendant's Proposed Construction** | Aerial images that were taken by a camera without a known spatial relationship to each other. |

The Independent of Each Other Limitation does not require an explicit claim construction. *Phillips*, 415 F.3d at 1312-13. The term is a straightforward statement using commonly understood words with widely accepted meaning that a factfinder could readily apply. For example, "independent" is a widely used English word, and there is no indication it is being used with a specialized meaning.

Even if the Court were to construe the Independent of Each Other Limitation, Nearmap's proposed construction is unduly narrowing because it requires that the aerial images be "taken by a camera," even though other means of obtaining aerial images are within the scope of the claims. *See* Section IV.B. Nearmap's proposed construction is also improper for seeking to limit all claims to embodiments where the aerial images have no "known spatial relationship to each other," even though dependent claim 8 of the '961 patent is directed to such an embodiment. "[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315. Thus, Nearmap's proposed construction should be rejected.

## V.    CONCLUSION

For the foregoing reasons, EagleView respectfully requests that the Court reject Nearmap's proposed constructions and find that no constructions are necessary.

Dated: January 27, 2023                    Respectfully submitted,

                                           */s/ Juliette P. White*

                                           L. Kieran Kieckhefer
                                           SHEARMAN & STERLING LLP
                                           535 Mission Street, 25th Floor
                                           San Francisco, CA 94105
                                           Telephone: 415.616.1100
                                           Fax: 415.616.1339
                                           kieran.kieckhefer@shearman.com

                                           Matthew G. Berkowitz
                                           Patrick Colsher
                                           Lillian J. Mao
                                           Yue (Joy) Wang
                                           SHEARMAN & STERLING LLP
                                           1460 El Camino Real, 2nd Floor
                                           Menlo Park, CA 94025
                                           Telephone: 650.838.3600
                                           Fax: 650.838.3699
                                           matthew.berkowitz@shearman.com
                                           patrick.colsher@shearman.com
                                           lillian.mao@shearman.com
                                           joy.wang@shearman.com

                                           Eric S. Lucas
                                           SHEARMAN & STERLING LLP
                                           599 Lexington Ave.
                                           New York, NY 10022
                                           Telephone: 212.838.4955
                                           Fax: 646.848.4955
                                           eric.lucas@shearman.com

                                           Juliette P. White
                                           Parsons Behle & Latimer
                                           201 South Main Street, Suite 1800
                                           Salt Lake City, Utah 84111
                                           Telephone: 801.532.1234
                                           Fax: 801.536.6111
                                           JWhite@parsonsbehle.com
                                           ecf@parsonsbehle.com

*Attorneys for Plaintiffs Eagle View*
*Technologies, Inc. and Pictometry*
*International Corp.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on the 27th day of January 2023, I caused to be electronically filed and served the foregoing PLAINTIFFS' OPENING MARKMAN BRIEF with the Clerk of the Court using the Court's electronic filing system, which sent notification of such filing to all attorneys listed on the docket.

*/s/ Juliette P. White*
_____

Juliette P. White
*Attorney for Plaintiffs*